# EXHIBIT L

# ORIGINAL

1

VOLUME: I
PAGES: 1-223
EXHIBITS: 1-7A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
-------------------------------x
                                :
LIBERTY MUTUAL INSURANCE        :
COMPANY,                        :
                  Plaintiff     :
                                :   CIVIL ACTION
           vs.                  :   NO. 96-10804-DPW
                                :
THE BLACK & DECKER              :
CORPORATION, BLACK & DECKER,    :
INC., BLACK & DECKER (U.S.),    :
INC., EMHART CORPORATION, and   :
EMHART INDUSTRIES, INC.,        :
                  Defendants    :
                                :
-------------------------------x
```

        DEPOSITION of ALAN D. SCHLEMMER,
taken on behalf of the Defendants, pursuant
to the Federal Rules of Civil Procedure, before
Corinne J. Turra, a Registered Professional
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the offices
of Willcox, Pirozzolo & McCarthy, P.C.,
50 Federal Street, Boston, Massachusetts,
on Thursday, April 26, 2001, commencing at
10:12 a.m.



HENNESSEY CORP., D/B/A
ROBERT H. LANGE CO.
50 Congress Street
Boston, Massachusetts 02109
617-523-1874 ° 800-645-6807 ° Fax: 617-523-7343

69

1    Mississippi Hearing Loss Claim at the New Orleans

2    meetings?

3        A.    Other than what I've just mentioned, I

4    can't recall anything else.

5        Q.    Okay.  You do recall that there was some

6    discussion regarding or, on the occasion of the

7    onset of the Mississippi Hand/Arm Vibration Claim?

8                MR. DUFFY:  Objection to form.  You

9    can answer.

10       A.    My recollection is that about that time

11   frame, yes.

12       Q.    And where did -- was this -- do you

13   remember a single discussion or was there more than

14   one discussion?

15       A.    I recall a discussion.

16       Q.    Where did the discussion take place?

17       A.    My recollection is it took place at one

18   of the meetings at the Westin Canal Place Hotel

19   during one of the breaks.

20       Q.    And who participated in that discussion?

21       A.    I believe that the discussion occurred

22   between obviously myself and one of the attendees

23   who was there on behalf of ESIS and CIGNA, and at

24   the time also there were I believe representatives

1    from Black & Decker and from Miles & Stockbridge.

2        Q.    Where specifically in the Westin Hotel

3    did this meeting take place?

4        A.    It was in one of the conference ballroom

5    type rooms in the hotel.

6        Q.    Were there any -- was it in the same room

7    that the quarterly defense strategy meeting was

8    being held?

9        A.    Yes.

10       Q.    Did it take place in some section of that

11   room?

12       A.    I remember that it was during a break.

13   And I believe that we were all standing.  And so

14   I'm thinking that we were probably somewhere in one

15   of the perimeter walls of the room just kind of

16   standing in a group.

17       Q.    Apart from the people participating in

18   this discussion who you've just listed, did anyone

19   else, was anyone else in a position to hear what

20   was being said to your knowledge?

21       A.    I don't think so.

22       Q.    Now, who was the ESIS representative?

23       A.    I believe the person at the time was

24   Malcolm Myers, but I'm not fully certain.  It's

71

1    been quite a few years.

2        Q.   Was there a CIGNA, a separate CIGNA

3    representative?

4        A.   No.

5        Q.   Was there any ESIS representative other

6    than Malcolm Myers?

7        A.   Again, if Malcolm is correct to my

8    recollection, I don't believe that there was a

9    separate ESIS and a separate CIGNA representative.

10       Q.   At that time did you have an

11   understanding as to what ESIS was?

12       A.   Yes.

13       Q.   What was your understanding?

14       A.   My understanding is ESIS, which I believe

15   stands for Employers Self-Insurance Services, is a

16   third-party administrator operation that is owned

17   by or operated by what was then the CIGNA Insurance

18   Companies.  And it provides self-insurance

19   services, claims-handling, those types of things,

20   on behalf of its customer clients.

21       Q.   And did you understand, have any

22   understanding as to its relationship with Black &

23   Decker?

24       A.   Yes.

72

1          Q.    And what was that understanding?

2          A.    My understanding is that Black & Decker

3     retained the services of ESIS to handle claims on

4     its behalf.

5          Q.    At the time that Linda McCroddan invited

6     you to the Philadelphia meeting did you understand

7     that she had a relationship with ESIS?

8          A.    I did.

9          Q.    And did you have an understanding at that

10    time as to what ESIS was?

11         A.    Yes.

12         Q.    And what was that understanding?

13         A.    It was the same as what I've just said.

14         Q.    And did you have an understanding as to

15    ESIS' relationship to Black & Decker at that time?

16         A.    I believe that Linda conveyed that

17    relationship.

18         Q.    And what was that relationship that she

19    conveyed?

20         A.    That ESIS was retained by Black & Decker

21    to provide claims-handling services to Black &

22    Decker.

23         Q.    Did you understand that they were acting

24    on behalf of Black & Decker?

73

1    A.    That was my understanding, yes.

2    Q.    Who was the Black & Decker representative

3    or representatives at this conference, this meeting

4    during the recess at New Orleans?

5    A.    My recollection is that I believe Clayton

6    Roop was there.  I know that Clayton was, I think,

7    nearing retirement at this point, so it may be that

8    he had actually moved on.  One of these meetings

9    tends to lead into another.

10    Q.    Just so the record is clear, I'm asking

11    you -- you said there was a break at the general

12    New Orleans meeting, and a group was in a portion

13    of the room talking outside of the hearing of the

14    others.  Do you have that meeting in mind?

15         MR. DUFFY:  Objection to form.

16    A.    Yes.

17    Q.    Okay.  Now, we're talking about that

18    particular meeting.

19         MR. DUFFY:  Same objection.

20    Q.    Was Clayton Roop at that meeting?

21         MR. DUFFY:  Same objection.

22    A.    Again, Jack, it's, you're asking me about

23    things that are almost 10 years ago now.

24    Q.    I know.

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

74

1        A.    And so I'm really trying to be as clear

2    as I can.  I believe that it was Clayton who was

3    there.  I do recall that there were representatives

4    of Black & Decker.  My recollection is I think

5    Clayton was the individual that was there.

6        Q.    Do you have a recollection of any other

7    Black & Decker representative there?

8        A.    I do not.

9        Q.    And you have a recollection there was a

10    Miles & Stockbridge representative?

11        A.    I believe so.

12        Q.    And who was that?

13        A.    I believe that it was Rich Kidwell.

14    John Sweeney may have also been there.  Because I

15    know about this point John was, I think, starting

16    to come into the picture.  But that's my

17    recollection.

18        Q.    Can you give us any idea as to the time

19    of this meeting?  Time of the year.  Let me

20    rephrase the question.  Can you give us any idea as

21    to what time this meeting occurred?

22        A.    I don't recall the specific time.

23        Q.    I suppose the New Orleans weather won't

24    help us, but can you remember what the weather in

75

1    New Hampshire was at the time of this meeting?

2           MR. DUFFY:  Objection to form.  You

3    can answer.  If you can.

4        A.    One might humorously say it's always cold

5    in New Hampshire, but I don't recall.

6        Q.    Do you remember what year this meeting

7    would have occurred?

8        A.    I believe that it was probably around

9    '93, '94.  Somewhere in that time frame.

10       Q.    At some point in time you became aware of

11   the hand/arm vibration claim; is that right?

12       A.    That's correct.

13       Q.    Did you become aware of the hand/arm

14   vibration claim shortly after it was made?

15           MR. DUFFY:  Objection to form.

16       A.    Yes.

17       Q.    In relation to that time, how long

18   following that time did this meeting occur?

19       A.    It was right at the same time.

20       Q.    Now, what did you say at this meeting?

21       A.    My recollection is that the basic gist of

22   my conversation was that in light of the fact that

23   the hand/arm vibrations were the same plaintiffs,

24   the same attorneys, the same tools, the same plant

1    and the same time frames, we're going to treat

2    these in the same way we're treating the hearing

3    loss cases from a cost-sharing standpoint.

4        Q.    And what did Clayton Roop say?

5        A.    Leaving that discussion, my belief was

6    that everybody was in agreement that these were

7    essentially going to be handled in the same

8    manner.

9        Q.    Not my question, though.  What did

10   Clayton Roop say?

11       A.    I don't recall specifically.

12       Q.    Do you recall in any way any utterance he

13   made at that?

14       A.    I do not.

15       Q.    Do you recall at all any gesture he made

16   at that?

17       A.    No.

18       Q.    What did Rick Kidwell say?

19       A.    I don't recall.

20       Q.    Do you recall any gesture that Rick

21   Kidwell made?

22       A.    I do not.

23       Q.    Do you recall any utterance at all that

24   Rick Kidwell made?

77

1          A.    I do not.

2          Q.    What did John Sweeney say?

3          A.    Again, assuming that John was there, I

4    don't recall.

5          Q.    Would it be fair to say you don't recall

6    whether he was there; therefore, you certainly

7    don't recall what he said?

8          A.    Well, as I testified to earlier, I

9    believe that the individuals there were the ones

10   that I've named.  But it's quite possible that,

11   because of the dynamics of time, that the names and

12   faces may be alluding me a little bit.

13         Q.    What did the ESIS representative say?

14         A.    My recollection is that the ESIS

15   representative concurred with my assessment.

16         Q.    What did the ESIS representative say to

17   concur?

18         A.    I don't recall specifically.

19         Q.    Do you recall in any way what words were

20   used by the ESIS representative?

21         A.    I do not.

22         Q.    Do you recall any gesture that the ESIS

23   representative made?

24         A.    No.

78

1      Q.    Do you recall any utterance at all that

2    the ESIS representative made?

3      A.    Don't recall specifically.

4      Q.    Is there anything that anyone said at

5    that meeting during the recess at New Orleans that

6    you can remember that you haven't told us?

7      A.    As I've said, Jack, my recollection is

8    that from the conversation, my understanding

9    leaving that was that we were all in agreement as

10   to how the hand/arm vibration cases were going to

11   be handled under the cost-sharing agreement.

12     Q.    If I can ask you to focus on my

13   question.  Is there anything that you haven't told

14   us that anyone said at the meeting?

15     A.    I can't recall anything further.

16     Q.    Is there any other occasion on which you

17   spoke to anyone outside of Liberty Mutual regarding

18   cost-sharing on the Mississippi Hearing Loss Case?

19     A.    Yes.

20     Q.    And when was that?

21     A.    I recall that sometime around the

22   mid-'90's I contacted Miles & Stockbridge to

23   inquire as to whether there were any further

24   defense bills forthcoming for the defense of the

82

1    Rick or someone in his office or in Miles &

2    Stockbridge's office at that time.

3        Q.    When, can you tell us when, other than

4    generally in the mid-'90's, that that call

5    occurred?

6        A.    I believe that it was probably around '94

7    or '95.

8        Q.    And what did you say in the telephone

9    conversation?

10        A.    My recollection is that I inquired as to

11    the current status of the litigation and any

12    additional defense bills that would be

13    forthcoming.

14        Q.    And what did Mr. Kidwell say to you?

15        A.    Well, again, I remember that I called to

16    Rick Kidwell's office.  And the reason I remember

17    that, Jack, is for Miles & Stockbridge the only

18    phone number I had in my Rolodex is a phone number

19    for Richard Kidwell.  I don't know whether it was

20    actually Richard that answered or whether it was

21    somebody who then directed me to someone else.

22            But my recollection is that at that

23    time the person who I spoke with was not aware of

24    any additional bills that were forthcoming and

1    thought that the bills had all been current, and

2    that was the extent of the call.

3         Q.   Was this person that you spoke to, could

4    you tell whether this person you spoke to was male

5    or female?

6         A.   I'm fairly certain it was a male.

7         Q.   Could you tell us what this person said.

8         A.   My understanding after the call from what

9    they said was that the bills were current and that

10   they were not aware of anything else that was

11   forthcoming at that point.

12        Q.   That's not my question.  Could you tell

13   what the person said, what words they used?

14                  Withdrawn.  Let me frame the

15   question properly.

16                  Could you tell us what words the

17   person you spoke to used in talking with you on

18   that occasion?

19        A.   I don't recall the specific words.

20        Q.   Can you paraphrase the words that were

21   used?

22        A.   Again, from the conversation my

23   understanding was that that was, that the bills

24   were current and that they were not aware of

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

84

1    anything else that we would be receiving.  And

2    that's the extent of my recollection after the

3    call.

4         Q.   Is it correct then that your answer is

5    you cannot paraphrase what the person said?

6                   MR. DUFFY:   Objection to form.

7         A.   I'll rely on my earlier answer.   I

8    believe I've done that.

9         Q.   Now, you testified that there was a

10   series of discussions with Rick Kidwell; right?

11   You recall that?

12        A.   Yes.

13        Q.   When was the first of those discussions?

14        A.   I believe that it was shortly after the

15   meeting in 1992.

16        Q.   And did you call him or did he call you?

17        A.   I don't recall who called whom.

18        Q.   What did you say to Mr. Kidwell?

19        A.   The discussion centered on the earliest

20   period of coverage for Black & Decker.   There was a

21   period of time from '64 through '70 that we were

22   unable to establish the existence of coverage, and

23   I believe the call was to discuss that issue.

24        Q.   Again, my question was what did you say.

              HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
                          617-523-1874

107

1    whatever agreement is ultimately made.

2        Q.    And then there is a phrase that appears

3    saying, "according to the percentages assigned to

4    each party."  Do you see that phrase?

5        A.    Yes.

6        Q.    Were percentages assigned at the

7    meeting?

8        A.    No.

9        Q.    Are you referring to something that you

10   anticipated would happen in the future?

11       A.    Yes.

12       Q.    Now, if you go to Paragraph 24,

13   Paragraph 24 begins with the phrase, "At that

14   time."  What time is referred to there?

15       A.    That is referring to the time of the

16   discussions referred to in Paragraph 3.  Not 3.

17   23.

18       Q.    So does "at that time" mean at the time

19   of the meeting in Philadelphia?

20       A.    I believe that to be correct.

21       Q.    Okay.  Further down in Paragraph 24 it

22   says, among other things, "After discussions were

23   had with Richard Kidwell of Miles & Stockbridge,

24   Black & Decker's counsel, it was ultimately agreed

108

1   that Liberty Mutual would fund 37.5 percent of the

2   incurred defense costs, and Black & Decker would

3   fund 33.5 percent."  Do you see that sentence?

4       A.   Yes.

5       Q.   Okay.  What discussions were referred to

6   there?

7       A.   I believe those discussions are the phone

8   calls that I've testified to earlier.

9       Q.   And on reading Paragraph 24, for that

10  matter looking at anything in the affidavit that

11  would help refresh your recollection, can you tell

12  us what Mr. Kidwell said in the discussions that

13  are referred to here?

14      A.   Paragraph 24 states that discussions were

15  had with Richard Kidwell and that it was agreed

16  that Liberty would fund 37 and a half percent, and

17  Black & Decker 33 and a half percent of the defense

18  costs.  I believe that's a fair description of the

19  discussions.

20      Q.   All right.  It says, "it was ultimately

21  agreed."  Do you see?

22      A.   I do see that.

23      Q.   Do you agree with me that's the passive

24  voice?

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

1       A.    Having to dig back to my days of

2    English 101, I think that's correct.

3       Q.    Can you tell us what Mr. Kidwell said by

4    way of making an agreement?

5       A.    Not specifically.

6       Q.    What did you say by way of making an

7    agreement?

8       A.    I don't recall specifically.

9       Q.    And do you consider that by the time you

10   had had your second conversation with Mr. Kidwell,

11   however, you and he had made an agreement on the

12   percentages that are set forth in Paragraph 24?

13      A.    As I stated earlier, I didn't recall the

14   exact number of phone conversations.  We've talked

15   about potentially the two that you referred to.

16          At the end of whatever sequence of

17   telephone conversations and dialogue I had with

18   Mr. Kidwell and/or representatives of Black &

19   Decker, my belief was that Black & Decker and

20   Liberty had reached an agreement that Liberty would

21   fund 37 and a half percent of the incurred defense

22   costs and that Black & Decker would fund 33 and a

23   half percent of the defense costs.

24      Q.    Okay.  And those, whatever the exact

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

1   Q. Did you receive Exhibit F from

2 Ms. McCroddan?

3   A. I believe that I did, yes.

4   Q. Okay. What did you do with the document

5 entitled Interim Cost Sharing Agreement after you

6 received it?

7   A. I believe that ultimately would have been

8 placed in the claims file.

9   Q. Did you ever sign it?

10   A. I don't believe that I did.

11   Q. Why didn't you sign it?

12   A. Because at the time, as it indicates in

13 the letter, it was only a proposed cost-sharing

14 agreement. Therefore, no final agreement had been

15 reached at that point.

16   Q. And what did you do with the document

17 attached to Exhibit G, which is entitled Interim

18 Cost Sharing Agreement?

19   A. As indicated in Exhibit I, ultimately I

20 signed the agreement on November 3rd of 1992. This

21 is also outlined in the affidavit as Paragraph 27.

22   Q. Why did you wait three months before you

23 signed it?

24   A. I don't remember why I waited three

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

112

1    months.

2        Q.    What did you do with the document after

3    you signed it?

4        A.    As outlined in Paragraph 29, the original

5    structure that was proposed by Linda McCroddan at

6    ESIS on behalf of Black & Decker was that each

7    carrier would sign the agreement and then forward

8    the agreement on to the next carrier on the list.

9             My recollection is that I did

10   forward the agreement on to the next carrier on the

11   list.  And I believe that that is also correct

12   because, as further outlined in Paragraph 29, the

13   cost-sharing agreement ultimately got held up at

14   the Home, meaning it clearly left Liberty and was

15   sent on to whomever was after us, whether that was

16   Home or one of the other carriers.

17       Q.    Well, what made Home after you?

18       A.    Because I had signed the agreement.

19   Therefore, I must have received the agreement in

20   order to send it on.

21       Q.    You're just speculating?  You don't

22   remember?

23       A.    It's not correct.  I do recall signing

24   and sending the agreement on.

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

113

1      Q.   On to whom?

2      A.   I don't recall which carrier was next on

3  the list.

4      Q.   Okay.  So you don't know to whom you sent

5  it?

6      A.   I don't recall as I sit here today.

7      Q.   Is there a transmittal letter anywhere?

8      A.   I don't recall.  There's not one

9  attached.

10     Q.   Have you searched for a transmittal

11 letter?

12     A.   To the extent we've produced documents in

13 this litigation and searched our records for all

14 relevant documents, yes, that search has been

15 completed.

16     Q.   Have you located any transmittal letter?

17     A.   As I sit here today, I don't recall

18 whether or not we did or did not.

19     Q.   In the ordinary course of business did

20 you send documents out without a transmittal

21 letter?

22     A.   You may or may not.

23     Q.   That wasn't my question, though.  Usually

24 did you send a transmittal letter with documents?

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

117

1    courtesy copy, it does state, "Enclosed you will

2    find the revised Interim Cost Sharing Agreement."

3              And I believe that this letter,

4    along with the letter of June 18th, 1993 wherein

5    bills are forwarded under the terms of the

6    cost-sharing agreement to myself, Jeanne Mathis,

7    Bob Pantano, and again with Rick Kidwell, Mike

8    Margiotta, Jean Montague all as recipients, and the

9    fact that we forwarded payment in accordance with

10   the request in the June 18th, 1993 letter and were

11   never advised that the payment was not correct or

12   improper is the reason why I believe that the

13   cost-sharing agreement had been reached.

14       Q.   I'm afraid you're not answering my

15   question.  Paragraph 30 says, "Nevertheless, the

16   parties had already previously agreed to the terms

17   of the cost-sharing agreement...."  The word

18   "previously" appears in that phrase.  When you did

19   this affidavit what was the time to which

20   "previous" referred?

21            MR. DUFFY:  I'm going to object to

22   all of the prefix to that question.  But you can

23   answer to the best you can.  Because I think you

24   did answer.

118

1          A.    I'm going to rely on my earlier

2     statement.

3          Q.    I'm going to insist that you tell me,

4     what was "previous"?  Withdrawn.

5                    What was the time referred to as

6     "previous" in that phrase?

7          A.    And again, Jack, I'm going to rely on the

8     answer I just gave you.

9                    MR. PIROZZOLO:  Can I have that

10    answer read.

11                   (Answer read.)

12         Q.    When do you say the cost-sharing

13    agreement had been reached, on what date?

14                   MR. DUFFY:  Answer if you can.

15         Q.    Withdrawn.  On what date do you say the

16    cost-sharing agreement had been reached?

17                   MR. DUFFY:  Objection to form.  But

18    you can answer.  If you can.

19         A.    As I testified earlier to, by the point

20    of the letter from Linda McCroddan at ESIS of

21    August 5 of 1992 addressed to me specifically, I

22    believe this letter reflects that the agreement had

23    been reached.

24         Q.    And had the agreement been reached in

119

1    oral communications?

2          A.    I believe in part, yes.

3          Q.    And who participated in the oral

4    communications?

5          A.    With regard to Liberty, as I've testified

6    earlier, discussions between Rick Kidwell on behalf

7    of Black & Decker and myself.  We reached an

8    agreement on the percentages Liberty Mutual would

9    share, and I believe Linda McCroddan at ESIS

10   coordinated similar type discussions with the other

11   carriers.

12         Q.    With whom?  I'm sorry.

13         A.    With the other carriers.

14         Q.    What did Rick Kidwell say to manifest his

15   agreement?

16         A.    As I testified earlier, I believe that

17   the outcome of our discussions was the agreement

18   that I've outlined already.

19         Q.    That not my question.  What words did he

20   use to manifest his agreement?

21         A.    I'll rely on my earlier testimony.

22         Q.    Can you tell us what words Rick Kidwell

23   said which you say manifest his agreement?

24                   MR. DUFFY:  Objection to the form.


HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

120

1          A.    And, again, I'll rely on my earlier

2     testimony.

3                      MR. PIROZZOLO:    I'm going to insist

4     on an answer to that, Peter.

5                      MR. DUFFY:    You got your ---

6                      MR. PIROZZOLO:    Would you confer

7     with Mr. Schlemmer and ask him to answer that

8     question?

9                      MR. DUFFY:    I thought you already

10    had his answer to that question.

11                     MR. PIROZZOLO:    I do not have his

12    answer to that question.

13                     MR. DUFFY:    Actually, what is the

14    question, Jack?

15                     MR. PIROZZOLO:    He has just said

16    that an oral agreement was reached in conversation

17    between him and Mr. Kidwell.    And I'm asking him

18    what Mr. Kidwell said to manifest that agreement.

19                     And I think referring to some prior

20    testimony is not an answer.    I'd like this witness

21    to tell me now what did Mr. Kidwell say to manifest

22    the agreement that Mr. Schlemmer says he made.

23                     MR. DUFFY:    Respectfully, Jack,

24    that's -- you've misstated his testimony.

121

1              MR. PIROZZOLO:  Well ---

2              MR. DUFFY:  And I believe he has

3    already answered that.

4              MR. PIROZZOLO:  Then he can answer

5    it again.

6              MR. DUFFY:  But you've misstated his

7    testimony.

8         Q.   Here is the question, and I insist on an

9    answer:  What words did Mr. Kidwell say, what words

10   did Mr. Kidwell use to manifest the agreement you

11   say he made before August 5th, 1992?

12             MR. DUFFY:  Well, again, Jack, I

13   disagree with the predicate.  But, Mr. Schlemmer,

14   you can answer it the best you can.

15        A.   I don't recall the specific words.

16        Q.   Can you paraphrase what Mr. Kidwell

17   said?

18        A.   Not as I sit here today.

19        Q.   Do you have any notes or memoranda or any

20   other thing that would assist you to remember what

21   Mr. Kidwell said?

22        A.   Nothing that I recall as I sit here right

23   now.

24        Q.   Did you speak with Mr. Kidwell between

               HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
                              617-523-1874

122

1    July 9th and August 5th of 1992?

2         A.    I don't recall specifically whether I did

3    or did not.

4         Q.    Whatever it is that Mr. Kidwell said to

5    manifest what you say made an agreement, was that

6    said before or after August 9th, 1992?

7                   MR. DUFFY:  Again, I got to object

8    to that, Jack, but he can answer as best he can.

9                   MR. PIROZZOLO:  Did I misspeak?  I'm

10   sorry.

11                  MR. DUFFY:  You consistently

12   misspeak with his testimony, Jack.

13        Q.    Whatever you say that Mr. Kidwell said to

14   manifest an agreement, whatever that may have been,

15   was that said between -- before July 9, 1992?

16                  MR. DUFFY:  Jack, again you're

17   mismating the testimony.  But he can answer the

18   best that he can.

19        A.    As I already stated, I don't specifically

20   recall the dates of the conversations.

21        Q.    Can you say whether it was before or

22   after July 9, 1992?

23                  MR. DUFFY:  Same objection.

24        A.    Sitting here today, no, I can't.


            HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
                          617-523-1874

174

1    related to both the hearing loss and hand/arm

2    vibration combined.

3        Q.   I guess the problem I have, are you

4    saying Mississippi Hearing Loss or Arkansas Hearing

5    Loss?

6        A.   Oh, I'm sorry.  Mississippi.

7        Q.   So your belief is that what is on the

8    page we're looking at relates to Mississippi

9    Hearing Loss and Mississippi Hand/Arm Vibration

10   which were combined in single bills?

11       A.   That's my understanding, yes.

12       Q.   If you go to, just so I can be clear, on

13   Page 16 of your affidavit there is a figure

14   $155,754.17.  Is that an amount that was paid ---

15       A.   Oh, you mean Paragraph 16.

16       Q.   Paragraph 16.  Is that an amount that was

17   paid in the Arkansas Hearing Loss claim?

18       A.   Oh, I'm sorry.  You know what, you're

19   right.  You made a very good point.  I'm mixing the

20   two up.

21       Q.   Mr. Schlemmer, if it will help move

22   things along, Paragraph 16 has a figure and

23   Paragraph --

24       A.   20.


HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

197

1      Q.   Did you attend the joint oversight

2  meetings after the case ended as to American

3  Pneumatic?

4      A.   I don't recall whether I went to any more

5  after that or not.

6      Q.   Would it be your best recollection that

7  you did not?

8            MR. DUFFY:  Objection to form.

9      A.   Sitting here today, I don't have a

10  recollection either way.

11      Q.   Do you remember any reason why you would

12  have stopped attending those meetings once the case

13  settled as to American Pneumatic?

14      A.   I don't have a recollection either way.

15      Q.   I'd ask you to turn to Page 33.

16            MR. DUFFY:  Do you mean 11, Jack?

17            MR. PIROZZOLO:  Page 11, yes.

18            MR. DUFFY:  Paragraph 33?

19            MR. PIROZZOLO:  Yes.  Did I say

20  Page 33?

21            MR. BINDER:  Yes.

22            MR. PIROZZOLO:  I misspoke.  I'm

23  sorry.

24      Q.   Paragraph 33, Page 11.  That refers to

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

198

1    your contacting Richard Kidwell in late 1994 or

2    early 1995.  Did you contact him by phone?

3         A.   As I testified to earlier, my

4    recollection is in late '94 or early 1995 I made a

5    phone call to Miles & Stockbridge through the

6    number that I had for Richard Kidwell.

7         Q.   And did you speak to Mr. Kidwell?

8         A.   As I testified earlier, I don't remember

9    whether I actually spoke with Richard Kidwell or

10   whether they gave me somebody else other than

11   Mr. Kidwell.

12        Q.   Well, if that's so, why did you say in

13   your affidavit that you contacted Richard Kidwell?

14        A.   Because, as I testified earlier, when I

15   think of the contact, when I made this call, I went

16   and got the phone number for Miles & Stockbridge.

17   The only number I have or had at the time was

18   Richard Kidwell, the only number I had in my

19   Rolodex.  So that's the number I called.

20        Q.   Are you saying that someone answered the

21   phone, but you didn't know whether or not that was

22   Richard Kidwell or not?

23        A.   I'm saying that I don't recall if, when I

24   ultimately got to speak to somebody on this issue,

199

1    I don't remember whether it was specifically

2    Richard Kidwell or if it was another attorney

3    speaking on behalf of Richard.

4         Q.    In other words, you made a call and

5    someone answered the phone?

6              MR. DUFFY:  Objection to form.

7         A.    Yes.

8              MR. DUFFY:  But you can answer.

9         Q.    Is that right?

10        A.    Yes, I believe someone would have

11   answered the phone.

12             MR. DUFFY:  Jack, we went through

13   this a lot.

14        Q.    And the person who answered the phone

15   said, this is Richard Kidwell, --

16             MR. DUFFY:  Objection.

17        Q.    -- but you don't know whether that was

18   Richard Kidwell or not?

19             MR. DUFFY:  Objection to form.  He's

20   testified to this earlier.

21        Q.    Is that what you're saying?

22             MR. DUFFY:  Objection.

23        A.    No, Jack, that's not what I'm saying.

24        Q.    Okay.  Go back over it.  It says in your

200

1    affidavit, "... I contacted Richard Kidwell...."
2    That was an affidavit you gave.

3         A.    That's correct.

4         Q.    And you knew it was important that it be
5    accurate?

6         A.    That's correct.

7         Q.    All right.  So something led you to think
8    that you had talked with Richard Kidwell; is that
9    correct?

10        A.    That's correct.

11        Q.    What I'm trying to find out is did the
12   person you call say, I'm Richard Kidwell, or
13   answer, this is Kidwell here, or did he say, this
14   is Mr. Kidwell?  Did something like that happen?

15             MR. DUFFY:  Objection to form, but
16   you can answer.

17        A.    As I've already testified, I don't recall
18   what the person at the other end actually said.
19   The reason I say I contacted Richard Kidwell is the
20   number I have for Miles & Stockbridge would have
21   been Richard Kidwell's.  So I would have dialed,
22   calling up, expecting to get Richard Kidwell.

23             Sitting here today, I don't remember
24   if ultimately I spoke with Richard or if I spoke

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

201

1    with someone else other than Richard when I

2    ultimately got to Miles & Stockbridge.

3        Q.    Forgive me, but Paragraph 33 says,

4    "Mr. Kidwell informed me that if there were any

5    more bills which needed to be paid, we would be so

6    informed;...," so on.  You said in your affidavit

7    that Mr. Kidwell informed you of this.

8        A.    Uh-huh.

9        Q.    Are you saying that you put that in your

10   affidavit even though you didn't know whether it

11   was Mr. Kidwell you were talking to?

12            MR. DUFFY:   Objection to form.  You

13   can answer.

14       A.    As I've stated, I drafted the affidavit

15   on December 4th of 1998.  To the best of my

16   recollection, approximately late '94, early '95 I

17   made a phone call to Miles & Stockbridge, dialing

18   the number I have for Richard Kidwell.  I believe

19   that the person I spoke to was likely to have been

20   Mr. Kidwell.  But, sitting here today, I can't

21   recall if that's specifically who I talked to or if

22   I talked to someone on his behalf, another

23   attorney, a paralegal, whomever.

24       Q.    Okay.  And, again, I want to make sure

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

202

1    I've got this straight, because it's important.

2    You're not saying that someone answered the phone

3    and said, I'm Richard Kidwell, and you doubt that

4    was really Richard Kidwell?

5            MR. DUFFY:  We covered this.  Asked

6    and answered.

7        Q.   Is that correct?

8            MR. DUFFY:  But you can answer

9    again.

10       A.   That's correct.  I'm not questioning the

11   integrity of the person who answered the phone.

12       Q.   Then, when you signed this affidavit, is

13   it so you didn't actually know who you had talked

14   to?

15       A.   Jack, I signed this affidavit on

16   December 4th of 1998.  It is now April, I think

17   26th, 28th, 2001.  Three years have passed.  I'm

18   looking at this and trying to recollect my

19   recollection of the events.

20            And I'm telling you that my contact

21   would have been Richard Kidwell because that's the

22   number I have to this day for Miles & Stockbridge.

23            And I believe that the person who

24   answered would have been either Richard Kidwell or

203

1    someone who was speaking either on behalf of or in

2    a capacity similar to that that Richard had at

3    Miles & Stockbridge.

4         Q.    When you signed the affidavit on

5    December 4, 1998, this was closer to the time of

6    the call than it is now; is that correct?

7         A.    Uh-huh.   Right.

8         Q.    And your memory then was clearer than it

9    would be today?

10              MR. DUFFY:   Objection to form.

11        Q.    Is that correct?

12              MR. DUFFY:   Objection.

13        A.    I believe that would be correct.

14        Q.    So you had a better memory then of who

15   you spoke to than you do now?

16              MR. DUFFY:   Same objection.

17        A.    Correct.

18        Q.    Is that correct?   So is it fair to say

19   that when you signed the affidavit you had an

20   active memory that you spoke with Mr. Kidwell?

21              MR. DUFFY:   Same objection.

22        A.    I believe at the time I signed the

23   affidavit that I believed that the person I spoke

24   to was Richard Kidwell.

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

204

1   Q. Today you're not so sure?

2      MR. DUFFY:  Objection to form.  You

3 can answer.

4   A. I don't believe today I have any

5 different recollection.

6   Q. So today you continue to remember you

7 spoke to Richard Kidwell?

8      MR. DUFFY:  Objection to form.  You

9 can answer.

10   Q. Is that correct?

11   A. I don't have any -- as I said, I don't

12 have a specific recollection either way.  I called

13 the number for Richard Kidwell.  I believe I spoke

14 to him or someone in his capacity.

15   Q. So you're not saying that you doubt the

16 accuracy of Paragraph 33 as you sit here today?

17      MR. DUFFY:  Same objection.

18   A. I don't doubt the accuracy, no.

19   Q. As far as you know, Paragraph 33 is

20 absolutely accurate?

21      MR. DUFFY:  Same objection.

22   A. I believe it to be an accurate statement,

23 yes.

24   Q. You say you believe it to be an accurate

HENNESSEY CORP., d/b/a ROBERT H. LANGE CO.
617-523-1874

205

1   statement?

2       A.   An accurate statement, yes.

3       Q.   And I think you told me that you have not

4   seen Mr. Kidwell's affidavit?

5       A.   I have not.

6       Q.   Is that correct?  Has anyone told you

7   what was in Mr. Kidwell's affidavit?

8       A.   No.

9       Q.   Has anyone given you any information

10  whatsoever about what Mr. Kidwell has said

11  regarding your affidavit?

12      A.   No.

13      Q.   No.  So you have no reason to doubt your

14  recollection based on anything Mr. Kidwell is

15  saying?

16      A.   No.

17              MR. PIROZZOLO:  Let's just go off

18  the record.

19              (Discussion off the record.)

20      Q.   (By Mr. Pirozzolo)  Can I ask you

21  to turn to Paragraph 6.  Paragraph 6 talks

22  about an exposure period.  Do you see that line?

23  "... beginning with the alleged first 'exposure'

24  time period...."  It's at the end.