# EXHIBIT P

Page 1

```
 1                              VOLUME: I
                                PAGES: 120
 2                              EXHIBITS: PER
                                     INDEX
 3          UNITED STATES DISTRICT COURT
                    FOR THE
 4          DISTRICT OF MASSACHUSETTS

 5

 6  ------------------------------
    LIBERTY MUTUAL INSURANCE
 7  COMPANY,
                Plaintiff
 8  -VS-
                            CIVIL ACTION
 9  THE BLACK & DECKER CORPORATION,   NO. 96-10804-DPW
    BLACK & DECKER, INC., BLACK &
10  DECKER (U.S.) INC., EMHART
    CORPORATION, and EMHART
11  INDUSTRIES, INC.,
                Defendants
12  ------------------------------

13        DEPOSITION of CLAYTON ROOP, a witness

14  called on behalf of the Plaintiff, pursuant to the

15  Federal Rules of Civil Procedure, by and before

16  Mona M. LaRiviere, Notary Public and Registered

17  Professional Reporter within and for the Commonwealth

18  of Massachusetts, at the offices of Holland & Knight,

19  LLP, 10 St. James Avenue, Boston, MA, on Tuesday,

20  April 3, 2001, commencing at 11:05 a.m.

21

22            Hennessey Corp., d/b/a
                ROBERT H. LANGE CO.
23              50 Congress Street
                Boston, MA  02109
24               (617) 523-1874
```

Page 3

```
 1                    _I_N_D_E_X_

    WITNESS NAME                        PAGE NO.
 2

    CLAYTON ROOP

 3    Direct by Mr. Duffy                   4

 4              _E_X_H_I_B_I_T_S_

 5  EXHIBIT NO.                           PAGE NO.

 6   1   Affidavit of Clayton Roop dated

         February 4, 1998                    26

 7

     2   Affidavit of Clayton Roop dated

 8       January 1999                        44

 9   3   Affidavit of Alan Schlemmer         74

10   4   Affidavit of Richard T. Kidwell dated

         January 6, 1999                     80

11

     5   Letter dated August 5, 1992 from Linda

12       McCroddan to Alan Schlemmer         83

13   6   Letter dated September 29, 1994 from Gary

         Duvall to Elaine Caprio-Brady      107
```

Page 2

```
 1  APPEARANCES:

 2      HOLLAND & KNIGHT, LLP

        (by Peter J. Duffy, Esq.)

 3      10 St. James Avenue

        Boston, MA

 4         on behalf of the Plaintiff;

 5      WILLCOX, PIROZZOLO & McCARTHY

        (by Jack R. Pirozzolo, Esq.)

 6      50 Federal Street

        Boston, MA  02110

 7         on behalf of the Defendants.

 8
```

Page 4

```
 1          STIPULATIONS
 2          It is hereby stipulated by and
 3  between the respective parties that the witness
 4  shall read and sign the deposition transcript
 5  within 30 days of receipt.  The filing and
 6  notarization are waived.
 7          It is further stipulated and agreed
 8  that all objections except as to the form of the
 9  question and motions to strike shall be reserved
10  until the time of trial.
11          CLAYTON ROOP, having been duly
12  sworn, testified upon his oath in answer to
13  interrogatories as follows:
14          DIRECT EXAMINATION
15  BY MR. DUFFY:
16 Q  Mr. Roop, did you prepare for the deposition
17    here today by reviewing any documents?
18 A  Yes, I did.
19 Q  What documents did you review?
20 A  My previous deposition, Mr. Schlemmer's
21    deposition, Kidwell and Sweeney, and I met with
22    Jack this morning.
23 Q  Why did you review the depositions?
24 A  Refresh my memory.
```

Page 49

1  is that this case was referred to ESIS pursuant
2  to the written contract that you've had since
3  '85-'86; is that right? There was no separate
4  retention in other words?
5 A  Correct.
6 Q  Was ESIS also the claims administrator for the
7  Hand-Arm Vibration claim; that is, the
8  Mississippi Hand-Arm Vibration claim, in the
9  Arkansas Hearing Loss claim as well?
10 A  Yes. I'm not sure of the Arkansas. Depending
11  on what years were involved, it could have been
12  Aetna.
13 Q  Just so I'm clear, Aetna has also acted as a
14  claims administrator for --
15 A  For Emhart.
16 Q  Emhart. Now, I note in the next sentence it
17  indicates "In its capacity as claims
18  administrator, ESIS received certain invoices in
19  connection with the defense of the Mississippi
20  Hearing Loss claim, primarily from Black &
21  Decker's local counsel." Do you see that?
22 A  Yes.
23 Q  Now, it indicates primarily from Black &
24  Decker's local counsel. Was ESIS provided any

Page 50

1  other invoices?
2 A  There may have been some of Miles' invoices that
3  they were provided.
4 Q  Do you have any record or does Black & Decker
5  have any record of what invoices ESIS was
6  provided?
7 A  We have a record of what they paid.
8 Q  But no record of what invoices they were
9  provided?
10 A  No.
11 Q  Other than local counsel invoices and possibly
12  some Miles & Stockbridge invoices as well, was
13  ESIS provided any other invoices that you know
14  of in connection with the Mississippi Hearing
15  Loss?
16 A  If there were expenses other than, you know,
17  counsel fees, ESIS would have paid those.
18 Q  But you have no way of knowing whether there
19  were any other such invoices?
20 A  Only what was paid.
21 Q  So, you only know the bottom-line dollar amount
22  of what was paid by ESIS, but you don't know
23  specifically the line items that were paid?
24 A  Oh, I knew -- I could -- yeah, the data base has

Page 51

1  the line items in it.
2 Q  Just so I'm clear, then, the ESIS record would
3  contain what invoices were paid out by ESIS and
4  to whom?
5 A  Yes.
6 Q  Going on in that same sentence, it indicates
7  that ESIS paid those invoices and sought
8  reimbursement of portions of those invoices from
9  Black & Decker's insurers; do you see that?
10 A  Yes.
11 Q  Why did ESIS only request or seek reimbursement
12  of portions of the invoices and not the whole
13  entirety of the invoices?
14 A  Well, they got a portion of the invoices from
15  the carriers they thought were involved.
16 Q  Why didn't they seek the entire amount from the
17  carriers they thought were involved? Why did
18  they seek only portions from the carriers
19  involved?
20 A  Well, I think in total they tried to collect it
21  all.
22 Q  What's the basis for your assertion that they
23  tried to collect it all?
24 A  Well, there are exhibits back here, I don't know

Page 52

1  what -- what they are, B, C and D I believe,
2  where they sent out -- they say they sent out,
3  tried to collect the numbers.
4 Q  Well, let's go on to the next paragraph --
5 A  All right.
6 Q  -- where it indicates that in a letter from
7  Linda McCrondan (sic), or McCroddan, of ESIS
8  dated September 4, 1992, and that's attached,
9  ESIS requested reimbursement from Black &
10  Decker's insurers for payments that ESIS had
11  made for defense costs in the Mississippi
12  Hearing Loss claims through September 4, 1992 as
13  follows, and then you provide the breakdown,
14  which indicates Liberty Mutual 37.5 percent,
15  Home Insurance 12.5 percent, London insurers
16  12.5 percent, and Twin Cities 4 percent; do you
17  see all that?
18 A  Yeah.
19 Q  Now, when I add that up, that provides a total
20  of I believe 65 percent --
21 A  Uh-huh.
22 Q  -- of the total payment that ESIS had made for
23  defense costs. So, that indicates that ESIS did
24  not request one hundred percent from the

Page 73

1 A  He would have conferred probably with me.

2 Q  I note the last sentence, even the last clause

3      of the first paragraph indicated "That since

4      signatures on the Cost-Sharing Agreement could

5      be obtained simply through the mail..." Do you

6      see that?

7 A  Yes.

8 Q  Do you know what the Cost-Sharing Agreement

9      reference there is?

10 A  There are references in here to a Cost-Sharing

11      Agreement somewhere -- oh, they're in

12      Mr. Shemer's (sic) deposition.

13          MR. PIROZZOLO: Schlemmer.

14 A  Schlemmer.

15 Q  Is it your understanding that the same

16      Cost-Sharing Agreement referenced by Mr.

17      Schlemmer is the Cost-Sharing Agreement

18      referenced here by ESIS?

19 A  It is sent to him, and I don't know that that's

20      exactly what Linda is referring to. It would be

21      speculation on my part.

22 Q  Referring to the third paragraph --

23 A  Yes.

24 Q  -- indicating "The original agreement is

Page 74

1      enclosed in Alan Schlemmer's letters and I ask

2      that an authorized representative of his company

3      sign the agreement and forward it to Jeannie for

4      signature" do you see that?

5 A  Yes.

6 Q  And then later on it indicates "After all

7      signatures are obtained, I will distribute

8      copies." Do you see that?

9 A  Yes.

10 Q  Are you aware of any Cost-Sharing Agreement that

11      was being circulated amongst the parties to this

12      letter at or about September 4th, 1992?

13          MR. PIROZZOLO: Objection.

14 A  Only the one that's in Mr. Schlemmer's

15      deposition.

16          THE WITNESS: Is that a deposition

17      or affidavit?

18          MR. PIROZZOLO: Affidavit.

19 A  Affidavit.

20 Q  I have a copy of Mr. Schlemmer's affidavit that

21      I believe you're referencing that I ask the

22      reporter to mark as Roop Exhibit No. 3.

23          (Document marked Exhibit No. 3.)

24 BY MR. DUFFY:

Page 75

1 Q  Referring you to tab D of the Schlemmer

2      affidavit, Roop No. 3, is the Interim

3      Cost-Sharing Agreement for Mississippi Hearing

4      Loss litigation, at that tab D the Cost-Sharing

5      Agreement that you were aware of being

6      circulated amongst the parties to the September

7      4, 1992 letter?

8 A  I believe this is the one that would have been

9      referred to.

10 Q  Have you seen that Interim Cost-Sharing

11      Agreement attached at tab D before?

12 A  Before what?

13 Q  Before today.

14 A  I probably did, yes.

15 Q  And when would you --

16 A  I don't --

17 Q  -- have seen it?

18 A  I don't -- back in '92-'93 sometime probably.

19 Q  How did you come about seeing it back in

20      '92-'93, that is, the Cost-Sharing Agreement?

21 A  Mr. Kidwell would have shown it to me.

22 Q  And did you review it at that time?

23 A  I don't know to what extent we reviewed it,

24      because it was his recommendation not to sign

Page 76

1      it.

2 Q  When did Mr. Kidwell recommend that you not sign

3      the agreement?

4 A  I don't know exactly.

5 Q  What did Mr. Kidwell say specifically?

6 A  I don't know that.

7 Q  Where did Mr. Kidwell say that you should not

8      sign it?

9 A  I never saw him in his office, so I'd have to

10      assume it was in my office.

11 Q  So you were sitting face to face with

12      Mr. Kidwell when he told you not to sign this

13      agreement?

14 A  Probably, yes.

15 Q  But you can't --

16 A  I can't say specifically.

17 Q  Do you recall what Mr. Kidwell said regarding

18      the agreement?

19          MR. PIROZZOLO: I don't mind Mr.

20      Roop answering these questions, but I have to

21      argue privilege. It slipped out, what

22      Mr. Kidwell said, before I had a chance to

23      instruct.

24          MR. DUFFY: The reporter is having

## Page 85

1 particular date it was, I don't know.
2 Q And who else was present?
3 A If she walked in this room I wouldn't know her.
4 Q Earlier in your deposition you indicated that
5 you were at the original meeting where the cost
6 sharings were discussed; do you recall that?
7 A Yes.
8 Q When was that meeting?
9 A I don't recall.
10 Q Is that the same meeting that you believe Linda
11 McCroddan may have been present at?
12 MR. PIROZZOLO: Objection.
13 A Restate the question.
14 (THEREUPON, the requested portion
15 of the text was read by the Court Stenographer.)
16 A The meeting you're referring to there?
17 Q Do you believe Linda McCroddan may have been
18 present at the original meeting where cost
19 sharings --
20 A Yes.
21 Q -- were discussed?
22 A I believe she was.
23 Q Do you recall any other people who were present
24 or who may have been present for that meeting?

## Page 86

1 A Mr. Kidwell and myself, and I believe there was
2 a representative from Liberty, and from Mendes &
3 Mount, which would have been Ed Man -- his
4 name's in here somewhere.
5 Q And where was that meeting?
6 A Philadelphia.
7 Q What was the purpose of that meeting?
8 A To get the insurance companies to pay their cost
9 of this litigation.
10 Q And what did you say during that meeting?
11 A I don't recall.
12 Q What did Mr. Kidwell say during that meeting?
13 A I don't recall.
14 Q What did the person from Mendes & Mount say
15 during --
16 A I don't know.
17 Q What did the person from Liberty Mutual say
18 during the meeting?
19 A I don't know, don't recall.
20 Q Can you recall anything at all said during that
21 meeting in Philadelphia?
22 A No. Sorry.
23 Q I note in paragraph 4 of Mr. Kidwell's
24 affidavit --

## Page 87

1 A Paragraph 4?
2 Q Yes, sir.
3 A Uh-huh.
4 Q It indicates, "I was not authorized on behalf of
5 Black & Decker to enter into a Cost-Sharing
6 Agreement of the type mentioned in the Schlemmer
7 affidavit." Do you see that?
8 A Yes.
9 Q Was Mr. Kidwell authorized to enter into any
10 type of Cost-Sharing Agreement on behalf of
11 Black & Decker?
12 A No.
13 Q Were you authorized to enter into a Cost-Sharing
14 Agreement on behalf of Black & Decker?
15 A At that time, no.
16 Q Was anyone within the company authorized to
17 enter into a Cost-Sharing Agreement?
18 A Yes.
19 Q Who?
20 A Would have been an officer, a treasurer who I
21 reported to.
22 Q And who specifically would that have been at
23 this time?
24 A Mr. Page.

## Page 88

1 Q Did you ever discuss the Interim Cost-Sharing
2 Agreement with Mr. Page?
3 A I don't recall.
4 Q What is Mr. Page's first name?
5 A Steven.
6 Q Do you know where Mr. Steven Page is today?
7 A Yes.
8 Q Where?
9 A He is president of Otis Elevator, which is part
10 of United Technologies.
11 Q Do you know whether Mr. Kidwell had any
12 conversations with Mr. Page?
13 A I don't recall.
14 Q Who executed the contract between Black & Decker
15 and ESIS?
16 A Who executed it?
17 Q Yes. Who signed it on behalf of Black & Decker?
18 A I did.
19 (Attorney and client conferring.)
20 Q I note --
21 A Yeah, in the first couple years -- we started
22 with them in '85 -- it probably was a Mr. Ortel
23 that signed it. O-R-T-E-L.
24 Q Okay.

Page 89

1 A  Who would have signed it, and I would have
2    signed it as an -- it's an annual deal, so I
3    would have signed it after '90.
4 Q  Sir, referring you to the third sentence of this
5    letter that you got, it indicates "You will note
6    Black & Decker has agreed..." --
7         MR. PIROZZOLO:  Which one are you
8    referring to, Exhibit 4?
9         THE WITNESS:  Exhibit 5.
10 Q  Yes, referring you to the August 5th, 1992
11    letter, Exhibit 5, and specifically the third
12    sentence, "You will note Black & Decker has
13    agreed to consider itself self insured for the
14    period of 1964 to 1970 since specific coverage
15    information has not been located to date"; do
16    you see that?
17 A  Yes.
18 Q  Following your receipt of this letter, did you
19    ever indicate to anyone that Black & Decker had
20    not agreed to consider itself insured for that
21    period?
22 A  I don't -- I don't recall whether it did or
23    didn't.
24 Q  Did you ever take issue with this language in

Page 90

1    this letter by ESIS on August 5th, 1992?
2 A  I don't recall.
3 Q  Do you know whether anyone --
4 A  This is not a letter by ESIS.
5 Q  Who is it a letter by then, sir?
6 A  Alan Schlemmer of Liberty.
7 Q  Isn't it a letter to Alan Schlemmer, sir, and a
8    letter from ESIS?
9 A  Oh, yes.  I'm sorry.  It is, yeah.  Yes.
10 Q  Did you ever inform Alan Schlemmer or anyone at
11    Liberty that Black & Decker had not agreed to
12    consider itself self insured for the period of
13    1964 to 1970?
14 A  Well, I'll answer by saying, it was never an
15    issue with us that we were anything but insured
16    by Liberty.
17 Q  For purposes of allocating percentage shares of
18    responsibility for cost sharing in the
19    Mississippi Hearing Loss litigation, did you
20    ever tell anyone at Liberty Mutual that Black &
21    Decker would not agree to consider itself self
22    insured for the period 1964 to 1970 following
23    this August 5th, 1992 letter?
24 A  I don't recall whether we did or didn't.

Page 91

1 Q  Sir, referring you back to your affidavit that
2    was marked as Exhibit No. 2, and specifically
3    referring you to tab C, it's the letter dated
4    June 18, 1993.
5 A  Uh-huh.
6 Q  Where did you obtain this letter from to attach
7    it to your affidavit?
8 A  I don't know where.
9 Q  Is it safe to say that this letter came from
10    your files?
11 A  It could have, but I was not copied on the
12    letter.
13 Q  I note the last sentence before the chart
14    portion on the first page of the letter
15    indicating, "According to our Cost-Sharing
16    Agreement, each carrier owes the following."  Do
17    you see that?
18 A  Yes.
19 Q  Do you know what the Cost-Sharing Agreement
20    referenced there is?
21 A  I can only assume she's referring to the one
22    that Alan had.
23 Q  And she is an agent of Black & Decker; is that
24    right?

Page 92

1 A  She had no authority to enter into an agreement
2    with black -- for Black & Decker.
3 Q  What is the basis for your assertion in that
4    regard?
5 A  We didn't give her any authority to enter into
6    any agreement.
7 Q  What authority did you give her?
8 A  She had specific instructions of how to handle
9    particular claims.
10 Q  What were her specific instructions as to how to
11    handle particular claims?
12 A  Well, they were spelled out in a -- in a Service
13    Agreement.
14 Q  Has that Service Agreement been produced in this
15    litigation?
16 A  I don't know.
17 Q  Is that the same contract that we discussed
18    earlier?
19 A  Yes.
20 Q  The one that Ortel signed originally and you
21    began to sign after a certain period, 1990 or
22    so?
23 A  Yes.
24 Q  And renewed on an annual basis?

Page 97

1  see that?
2 A Yes.
3 Q Did you have any discussions or meeting with any
4   of Black & Decker's carriers with respect to
5   cost sharing on the vibration claims?
6 A No.
7 Q Just so I'm clear, then, the Philadelphia
8   meeting we discussed earlier concerned only the
9   Mississippi Hearing Loss; is that correct?
10 A Yes.
11 Q Do you know whether ESIS ever received word from
12   Black & Decker's corporate counsel, Miles &
13   Stockbridge, on the cost sharing arrangement for
14   the vibration claims?
15 A No, I don't.
16 Q Let me ask you this, Mr. Roop, if there was no
17   Cost-Sharing Agreement between the parties, why
18   is it, then, that ESIS was not billing Black &
19   Decker's insurance carriers for one hundred
20   percent of the cost of the Mississippi Hearing
21   Loss litigation?
22       MR. PIROZZOLO: Objection.
23 A I believe that Liberty was taking the position
24   that it was only responsible for a portion of

Page 98

1   the -- of the loss on our -- and not the full
2   responsibility was theirs.
3 Q And so ESIS, is it your understanding, simply
4   went along with Liberty's position and only
5   billed it for a portion?
6 A At that time, yes.
7 Q You indicated "At that time." Has ESIS ever
8   billed Liberty for more than a portion?
9 A Not that I'm aware of.
10 Q Is it fair to say, then, that ESIS was
11   proceeding under the assumption that there was a
12   Cost-Sharing Agreement for the Mississippi
13   Hearing Loss litigation?
14       MR. PIROZZOLO: Objection.
15 Q Do you have any documents or other information
16   to suggest that ESIS was acting under anything
17   else other than the assumption that the
18   Cost-Sharing Agreement was effective?
19       MR. PIROZZOLO: Objection.
20 A They were probably operating under the
21   assumption that it would be executed, but it was
22   never executed.
23 Q And was Black & Decker also operating under the
24   understanding that the Cost-Sharing Agreement

Page 99

1   for the Mississippi Hearing Loss litigation
2   would be executed?
3       MR. PIROZZOLO: Objection.
4 A Being as nobody -- I did not have the authority
5   to sign a document like that, I can't say
6   whether we would have eventually signed it.
7   Certainly would not have signed it without the
8   years in question.
9 Q Do we have any documents or information to
10   suggest that Miles & Stockbridge was acting
11   under any understanding other than that the
12   Cost-Sharing Agreement for the Mississippi
13   Hearing Loss litigation was effective?
14       MR. PIROZZOLO: Objection.
15 A Say that again. I'm not so sure whether the
16   answer, right answer is yes or no because of the
17   way you worded the question.
18 Q Is it your understanding that Miles &
19   Stockbridge was operating under the
20   understanding that the Cost-Sharing Agreement
21   was effective?
22       MR. PIROZZOLO: Objection.
23 A They were not operating under the assumption
24   that the cost agreement was effective.

Page 100

1 Q And what is the basis for your assertion in that
2   regard? Because we've just seen documents where
3   attorneys at -- well, we have just seen a
4   document where there was reference to the
5   Cost-Sharing Agreement by Miles Stockbridge.
6       MR. PIROZZOLO: Objection.
7 Q You can answer.
8       MR. PIROZZOLO: Which document?
9   Which document? I don't know what document
10   you're referring to.
11       (Short pause.)
12       MR. PIROZZOLO: Care to rephrase
13   your question?
14       MR. DUFFY: Let's stay off for a
15   moment, Jack.
16       (THEREUPON, there was a discussion
17   off the record, after which the following
18   proceedings were had.)
19       MR. DUFFY: Back on. Jack, you're
20   right. Actually, it was ESIS.
21 BY MR. DUFFY:
22 Q Is it your understanding that ESIS was operating
23   under the understanding the Cost-Sharing
24   Agreement was effective?

## Page 101

1        MR. PIROZZOLO: Objection.

2 Q    Because we've seen the documents.

3 A    I think they thought plenty of times it was not

4        signed and executed so, therefore, it couldn't

5        be effective.

6 Q    Where has ESIS said that it was not signed and

7        executed and could not, therefore, be effective?

8 A    Okay. But could not be effective because my --

9        they didn't say that. They state at various

10      times that it was not executed and signed by

11      both parties.

12 Q   Did they ever say this to you personally?

13 A   I don't recall.

14      MR. DUFFY: Can we take a quick

15      break now?

16      MR. PIROZZOLO: Sure.

17      (THEREUPON, there was a recess

18      taken, after which the following proceedings

19      were had.)

20      BY MR. DUFFY:

21 Q   Referring you to paragraph 16 of your second

22      affidavit, Mr. Roop. It's the Exhibit No. 2.

23      MR. PIROZZOLO: Paragraph 16? I

24      just didn't hear.

## Page 102

1        MR. DUFFY: Exhibit -- paragraph 16

2        of Exhibit 2.

3        MR. PIROZZOLO: Thank you.

4 Q    It indicates that ESIS also paid invoices for

5        defense costs that Black & Decker incurred in

6        the Mississippi Hand-Arm Vibration claim; and

7        then it goes on to indicate, "The business

8        records that I have reviewed indicate that ESIS

9        did not seek reimbursement for defense costs in

10      the Mississippi Hand-Arm Vibration claim from

11      any of Black & Decker's insurers." Do you see

12      that?

13 A   Uh-huh.

14 Q   Do you know why it is that ESIS did not seek

15      reimbursement defense costs from Black & Decker

16      insurers in the Hand-Arm Vibration claims?

17 A   Well, there was not an interim agreement for

18      that, so I would assume that that's the reason

19      they didn't.

20 Q   Was there an interim agreement with respect to

21      the Mississippi Hearing Loss claims? Because I

22      understood your position was that there was no

23      such agreement.

24 A   Well, there's a draft of an agreement called

## Page 103

1        "Interim Cost-Sharing Agreement, Mississippi

2        Hearing," that's what Mr. Schlemmer says.

3 Q    And you believe the existence of that document,

4        which is Exhibit D to the Schlemmer affidavit,

5        accounts for the reason why ESIS submitted the

6        Mississippi Hearing Loss invoices for

7        reimbursement but not the Mississippi Hand-Arm

8        Vibration invoices?

9 A    They're two different cases.

10 Q   Did Black & Decker ever request that its

11      insurers reimburse the cost of the Mississippi

12      Hand-Arm Vibration claim?

13 A   Not that I'm aware of.

14 Q   With respect to paragraph 21 of your affidavit,

15      Exhibit No. 2, and specifically the second

16      sentence there, and we're moving on to the

17      Arkansas Hearing Loss claim, you indicate,

18      "During the course of the Arkansas Hearing Loss

19      claim there was an arrangement to pay for

20      defense costs among Farrel's insurers that is

21      set forth in a March 15, 1993 letter"; do you

22      see that?

23 A   Yes.

24 Q   Was there any similar arrangement in the

## Page 104

1        Mississippi Hearing Loss claim that you were

2        aware of?

3 A    Restate your question again.

4 Q    Let me put it this way, sir -- actually, let's

5        flip to the letter, the letter referenced there.

6        It's tab G of your Exhibit No. 2.

7 A    Yeah.

8 Q    It's the March 15, 1993 letter to Black & Decker

9        from Delores Ladd; do you see that?

10 A   Which schedule is that?

11 Q   G.

12 A   From Delores Ladd, yes.

13 Q   Who is Delores Ladd?

14 A   Delores Ladd is an employee of ESIS. I believe

15      she's in -- was in Dallas or Houston or

16      somewhere in Texas.

17 Q   Now, you indicate that this is an arrangement

18      for payment of defense costs among Farrel's

19      insurers; is that right?

20 A   In response --

21 Q   In paragraph 21?

22 A   Uh-huh.

23      MR. DUFFY: Did you get the Uh-huh?

24      THE WITNESS: I'll give you a yes